UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Criminal Case No.  03-cr-00232-RPM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

EDWARD P. MATTAR, III,
THOMAS ALAN BOYD,
JACK O. GRACE, JR.,

        Defendants.

---

## FINDINGS PURSUANT TO RULE 23(c)

---

In 1989 Edward P. Mattar, III, purchased Thornton U.S. Industrial Bank, a state chartered financial institution in Thornton, Colorado.  Mattar has a law degree but never practiced law.  He lived in Massachusetts where he managed a commercial college.  The Thornton bank was small: it  had only four employees.  Mattar changed the state chartered bank to a commercial state bank with deposits insured by the Federal Deposit Insurance Corporation (FDIC) and changed the name to BestBank (Bank).  Because Mattar had no banking experience, regulatory approval for his ownership of the Bank was on condition that he employ experienced bankers to operate it.

In December, 1992, Mattar hired Thomas Alan Boyd to serve as President of the Bank agreeing to an equal division of profits.  Boyd had been president of a bank in South Dakota.  In October, 1993, Mattar hired Jack O. Grace, Jr., as Chief Financial Officer.  Grace is an accountant who had experience as a bank examiner with the

Office of the Comptroller of the Currency.  As the sole shareholder of the Bank, Mattar

appointed the Board of Directors, consisting of Boyd, Grace, Joanne Novelli, his former

secretary who had become a mortgage broker, Maralynn Haney, a real estate broker,

and Richard Duran, the holder of a doctorate in education in a community college in

Arizona.  Charles Wolfschlag, an existing employee of the Thornton bank, was also

appointed to the board and as Cashier.

Mattar and the other bank officers developed a business plan to make the Bank

a niche commercial bank providing services not ordinarily available in other banks.

Thus, BestBank placed ATM machines in off-site locations, made student loans to non-

traditional students and paid above-market interest rates on certificates of deposit to

larger investors with restrictions on withdrawal of funds.  BestBank moved to a

favorable business location in Boulder, Colorado, in 1995.

One of the new directions taken by BestBank was the issuance of Visa credit

cards in the sub-prime market.  The sub-prime market consists of persons whose

income and circumstances do not qualify them for credit card loans from most

commercial banks.  Loaning money to persons with bad or no credit history is

inherently risky and requires the lender to charge high interest rates and fees to be

profitable by offsetting expected delinquencies.  South Dakota had become a favorable

location for that market after repeal of its usury laws.  Boyd had experience with this

market at the bank in South Dakota.  While BestBank had several credit card

programs, the principal effort started with an agreement made with Century Financial

Services, Inc., on February 22, 1994, called the Marketing, Processing and Consulting

2

Agreement ("Marketing Agreement").  Exhibit 41.

Century Financial Services, Inc., and Century Financial Group are two related corporations owned and operated by Douglas Baetz and Glenn Gallant.  They also owned other business entities, some of which were used in the course of Baetz' and Gallant's dealings with BestBank.  They are all referred to collectively as "Century."  Boyd knew Baetz and Gallant from Century's business with the bank in South Dakota where Boyd had worked.  Under the Marketing Agreement, Century solicited applications for Visa credit cards to be issued by BestBank and Century was responsible for providing the processing and management of the credit card portfolio, including collections from the cardholders.  BestBank's compensation was set at an interest rate of 6% based on the amount of the receivables due from cardholders with Century receiving all other fees and charges.  Essentially, BestBank was a passive investor in Century's sub-prime credit card portfolio for a 6% return.

Century promised to indemnify the Bank against losses by purchasing monthly those card accounts that were over the limit and contractually delinquent for more than 120 days and agreed to establish and fund a loss reserve account at BestBank in an initial amount of $25,000 with quarterly adjustments for charged off accounts over and above any security deposits under a formula described in Section 3.5 of the Marketing Agreement.  Exhibit 41.6, 41.7.  The agreement expressly prohibited re-aging of accounts.  BestBank established the underwriting criteria for qualifying borrowers.

In the beginning in 1994, the Century program was limited to secured cards, that is, the borrower was required to pay a deposit to a no interest account at the Bank

equal to the amount of the credit limit on the Visa card, with a minimum deposit of $250. Cards could be issued for larger limits with larger deposits.  Under Century's marketing program, approved by BestBank, a written application with an initial fee of $20 was to be submitted to obtain a BestBank Visa card for a credit limit in the amount of the security deposit.

The cardholder agreement also required payment of a $129 annual fee and minimum monthly payments of $20 with 18% interest on the account balance.   Century was responsible for direct mail and telemarketing to obtain applications for secured card accounts and serviced the secured card accounts, interacting with a computing system operated by First Data Resources (FDR) as the processor of information relevant to the loan accounts.

Century opened a Bankcard Center adjacent to BestBank in Thornton to perform the servicing function and placed it under the operating control of William Schultz who had been in charge of credit cards and merchant accounts at First Interstate Bank in Sioux Falls, South Dakota, when Alan Boyd worked there.

FDR was and is a company that performs the processing functions for many credit card issuers.  FDR produced daily a ledger activity report, called a CD-121 providing a "snapshot" of the portfolio on that day.  Exhibit 48 is an example.  Those daily reports are separated according to the particular types of cards, classified by "Prin" numbers.  FDR also produced a computer generated monthly report called a CM-051.  The CD-121's and CM-051's were available on line at BestBank's computer terminals.  Bankcard Center prepared and sent to BestBank a monthly credit card

4

report recapping information for each month and the two preceding months showing the number of cards at the beginning of each month, the new cards issued, the number of cards at month's end, the number of accounts secured by savings accounts, the aggregate balances and delinquencies.  Exhibit 75.

Cardholders mailed their payments to BankCard Center or paid through a Western Union telegram program.  BankCard Center transmitted payment information that was recorded in FDR computer records and BankCard Center deposited payments in Century's operating account in BestBank.  Century also maintained a reserve account at the Bank to cover Century's obligations to purchase delinquent accounts. BestBank also had an account for the security deposits paid by cardholders.

Century's aggressive marketing generated some complaints.  Exhibit 1371 is a letter from James T. Dillon, Chief Deputy Bank Commissioner for Colorado, to the Board of Directors of  BestBank dated September 23, 1994, summarizing complaints from consumers, banks and attorneys' general offices concerning high pressure marketing tactics involving young unsophisticated consumers and the elderly.  The Bank was directed to take corrective action.  That letter was referred to the BankCard Center to prepare a response for the Bank to submit.

Century's marketing program appeared to be very successful.  A large number of new accounts were recorded in the FDR system and became loans receivable in BestBank's records.  The number of new accounts reported was far greater than the payments made, thereby inflating the value of the Bank's records of receivables due from cardholders.

Baetz and Gallant directed the BankCard Center's employees to follow fraudulent practices having the effect of obtaining Bank financing by crediting Century's operating account for amounts that appeared to be secured loans to cardholders. Century opened secured card accounts without receipt of the minimum $250 security deposit.  Despite the lack of security deposit, Century caused the $129 annual fee to be credited to its operating account and recorded as a loan receivable on the Bank's books.  Despite no actual cardholder payments, Century caused program revenues, fees and finance charges to be credited to its operating account.  These charges were placed on the cardholder accounts along with the amounts due as security deposits. The plastic cards themselves were not issued for many accounts and cardholder statements of amounts due were prepared but not mailed.  They were stored in bulk at BankCard Center.  These non-performing accounts with their balances due were carried as loan receivables inflating the value of the Bank's assets.  Century disguised the false reporting of security deposits by transfers of funds from its operating account recording them as receipts from cardholders.

There were many valid accounts with actual security deposits and valid charges. Many of those accounts became delinquent for non-payment.  Century re-aged non-paying accounts to hide the delinquencies and thereby avoid its obligation to purchase them under the Marketing Agreement.

The Bank hired Jon Weidmaier to supervise the Century credit card program. He had prior experience at other banks with managing merchant accounts but did not have experience with management of sub-prime cardholder accounts.  Weidmaier was

6

deceived by the records he was receiving.

On January 27, 1995, Wiedmaier wrote to Schultz with copies to Boyd and Grace, saying that he was concerned about the Bank's "contingent liability" for total unused credit and "overline" accounts. He also noted that accounts with balances of annual fees, late charges and finance charges were delinquent and were apparently being "re-aged on a monthly basis." Exhibit 50.

Weidmaier expressed his continuing concerns about the Bank's safety to Boyd and Grace in May, 1995. Boyd wrote to Baetz and Gallant, with copy to Grace, under date of May 16, 1995, raising questions about cards that had receivable balances with no security deposit and re-aging of accounts as contrary to the Marketing Agreement. Exhibit 58. Boyd wrote that it appeared that the Bank had nearly $1,000,000 in unsecured credit card receivables with a 50% increase in delinquent accounts during April. Noting that unless this situation "reverses itself" the reserve for loan loss will be inadequate, Boyd asked for more information and direct access to FDR reports. Those reports were already available at the Bank. Weidmaier had them.

On May 25, 1995, Grace wrote to Boyd, copy to Mattar, inferring that Grace and Wiedmaier had met with Schultz and reviewed the FDR system documentation. Grace noted the absence of security deposits on many accounts and that security deposits were being applied to the balances of some accounts to bring them current without entering charge-offs on FDR records. Exhibit 80. Boyd wrote again to Baetz and Gallant under date of May 26, 1995, directing immediate implementation of two policies: no accounts to be placed on the FDR system without a completed application

from the customer accompanied by a security deposit and all accounts that are 120 days delinquent on the FDR system to be charged off immediately regardless of which age category the account was placed in by application of the security deposit. Exhibit 81.

BestBank closed the Century secured card portfolio by selling approximately 20,000 performing accounts to BANKFIRST in Sioux Falls, South Dakota, in the form of a Participation Agreement for a 100% participating ownership interest in the accounts transferred. BankFirst was to pay Century $100 for each loan and to pay BestBank the unpaid principal balance of each loan with adjustments for charge-offs during the following 24 months. Century was signatory to the agreement dated December 22, 1995. Exhibit 1111.

Century received approximately $1.9 million from BANKFIRST and paid over $1 million to BestBank on February 22, 1996, by a transfer from the operating account. Exhibit 1113. Another $500,000 from these proceeds went to set up a reserve for non-performing accounts sold. The evidence does not show that BestBank sustained a loss from the Century secured card program. It does show that Century could not be trusted to meet the obligations of the Marketing Agreement.

In May, 1996, Century began a new program marketing unsecured BestBank Visa credit cards to those who joined the All Around Travel Club (AATC) for a membership fee of $498 and who paid a $45 annual fee for the card with a $600 credit limit. Thus for agreeing to pay $543, the borrower got a card giving him the ability to charge $57. Additionally, those joining the AATC were to receive a packet of benefits,

including the opportunity to take a cruise in the Carribean upon payment of a low price, travel discounts described in a brochure, a membership card and a videotape advertising the cruise.  Century established the AATC and controlled all aspects of this program, using some third-party vendors for preparation and mailing of the fulfillment packages as well as telemarketing.  The cruise trip was operated by a company owned by Baetz and Gallant.  The AATC members received BestBank Visa credit cards and, as with the secured card program, Bankcard Center and FDR provided servicing and processing of the AATC cardholder accounts.

As designed, a person giving an affirmative response to the scripted solicitation by telemarketers was to submit a written application with a $20 payment to open the account in the computer system.  The plastic credit card was then to be sent along with the fulfillment package to the new cardholder.  In practice, accounts were set up by Century without receipt of the signed application and $20 payment.  The $543 membership fee was immediately charged to the account, generating that amount of credit in Century's operating account at BestBank.  The cardholder account was recorded as a loan receivable in BestBank's books.  For some accounts, no application or $20 payment was ever received, making those accounts fictitious.  For some accounts, no plastics (cards) were ever sent and no fulfillment packages were sent. There were also valid accounts with full performance by AATC member cardholders.

Michael Mansueto managed the AATC pursuant to an agreement with Century and under the control of Baetz.  Mansueto was responsible for the preparation and delivery of the fulfillment packages by vendors he hired for that purpose.  The AATC

records were maintained in the computers of a company called KamTel.  The number of

cards issued, the number of membership certificates printed and the number of

fulfillment packages prepared and mailed were all far below the number of cardholder

accounts recorded in the FDR system and on BestBank's records of loans receivable.

Thus, the value of the portfolio as measured by the predictability of payment of the

account balances was highly inflated.

BestBank hired John Schmalzer as Risk Manager in 1996.  He had been an

FDIC bank examiner who participated in an examination of BestBank in 1995.

Schmalzer prepared and submitted monthly Risk Management Reports to the Board of

Directors.  He became concerned about an apparent increase in credit card

delinquencies and negotiated with Baetz an addendum, dated September 30, 1996, to

the Marketing Agreement to increase the amount of the Loss Reserve Account and to

change Century's obligation to purchase accounts to those delinquent 60 or more days.

Exhibits 41.23 and A160.

In October, 1996, Baetz and Gallant saw increasing delinquencies in cardholder

accounts and began to use FDR transaction code 255 to cause credits to be posted to

delinquent accounts as "merchant returns," thereby eliminating the delinquencies on

those accounts.  This transaction description was misleading in that it suggested

returns from cardholder purchases but in actuality the credit was from Century on

delinquent cardholder accounts.

In October, 1997, the card processing function was transferred from FDR to First

Independent Computer (FICI), a company in Abilene, Texas, controlled by Baetz and

Gallant.  With that change, they obtained control of all of the processing and servicing of this portfolio.  FICI produced daily reports on a computer system called CardPac, similar to the CD-121's of FDR.  Both FDR and FICI used transaction codes ("tran codes") in their computer system for recording different events, including charges, payments, and merchant transactions.  These codes were different in the two systems and when the data were transferred between the systems, a conversion table was set up with transaction code numbers and transaction descriptions compared.  Exhibit 28.2-28.3.  FICI had many more tran codes than FDR.  Olin Beard, a FICI employee was charged with making the transfer of records from FDR to FICI.  Whereas FDR had Tran Code 271 for payment, FICI had Tran Codes 20, 21, and 22, described respectively as "payment-thank you, cash payment-thank you, and retail payment-thank you."

Bankcard Center was moved from Thornton to Ft. Lauderdale, Florida.  Penny McDowell replaced Schultz as manager.  She had no prior knowledge of the systems and received on the job training, learning only enough to perform her daily tasks.  Her supervisor was Peg Hirst, who cautioned McDowell to be careful in her communications with the Bank.  The financial records of Century were in Eautaville, South Carolina, where Melody Long was Controller and where Baetz lived.  Cardholder payments were sent to FICI in Abilene, Texas, where it had an account at Security State Bank, rather than to the Bankcard Center.

To disguise the facts that many of the AATC accounts were fictitious and others were non-performing, Century manipulated the processing records of FDR and FICI.

The principal method used was posting $20 credits to cardholder accounts to falsify transfers of funds from the Century operating account at BestBank.

When FDR was the processor, the transfers were identified as "merchant returns" under Tran Code 255.  When the processing function was transferred to FICI, Century caused the credits it generated to be identified as cardholder payments under Tran Code 22.

Melody Long was responsible for the accounting for the credits with necessary work by Penny McDowell.  A software program from KamTel was used to track the credits in a daily report showing how much money Century was spending on the credits.  Exhibits G-7 through G-155.  These reports described as "Monetary Transactions" went to Long, Schultz, Peg Hirst and to Lisa Nemetz, another Century employee.  The credits were shown as a subtraction from receipts and the net figure was given.  These internal Century reports did not go to BestBank.  As Controller, Long carried Century's cost of the credits as costs relating to revenue in the profit and loss statements she prepared for the Bank.  Long used the guise of "rebates" to account for the credits in Century's general ledger.

The false reporting of credits was based on transfers of funds from Century's operating account and cost Century almost $50 million from 1996 to the Bank's closing in July, 1998.

There were performing credit card accounts both in the secured card and the AATC portfolios.  These accounts resulted in substantial income to Century and to BestBank.  As previously noted, it is in the nature of the sub-prime credit card lending

business that there will be many cardholders who will not pay what they owe.  Because

it is expected in the industry that there will be a high rate of non-performing cardholder

accounts, good banking practice requires the maintenance of adequate reserves for

delinquent accounts.  The profit in sub-prime lending is made by charging front-end

fees to obtain the cards rather than in generating interest income on the balances in

accounts because many cardholders will be unwilling or unable to make their payments

on time or at all.  Boyd's experience in South Dakota was with accounts that required

subscription fees, legal in that state.  Exhibit 339.  Colorado restricted the amount that

could be charged as a subscription fee for sub-prime cards.  The requirement to

purchase a membership in the AATC served as a subscription fee   As noted, BestBank

contracted with Century in the Marketing Agreement to protect against losses by

Century's obligation to purchase delinquent accounts and Century did make substantial

payments.  Century paid for the $20 credits to AATC cardholder accounts by

withdrawals from the Century operating account but those payments were in the

aggregate far below what Century should have paid for non-performing accounts.

Century also was obliged under that agreement to maintain a reserve account at the

Bank and did so but in an amount substantially less than what was required under the

Marketing Agreement.  Century also paid the Bank $1,500,000 on December 31, 1996,

identified as a premium on participations purchased during the fourth quarter of 1996.

Exhibit 1100.4

Because the Bank's receipt of 6% interest proved to be inadequate to meet

capital requirements for support of the loans receivable, a new Marketing, Processing

and Consulting Agreement was entered into, dated January 2, 1997.  Exhibit 465.

Addendum "A" to that agreement was specific to the AATC and provided for the Bank to

receive a merchant discount fee of 5.02% on net new sales and a termination fee of

$48 per cardholder account which is terminated, reversed or canceled.  Thus,

BestBank was to receive 5.02% of the $498 membership fee in the AATC and a $48 fee

for accounts that were closed for any reason.

This new agreement was suggested by Boyd in a letter to Baetz and Gallant,

dated June 10, 1997, in which Boyd stressed that the Bank needed additional earnings

of $2,750,000 to have adequate capital to meet regulatory requirements.  Exhibit 1003.

In a follow-up letter on July 30, 1997, to Baetz and Gallant, Boyd detailed the Bank's

need for increased capital and additional earnings to support the large growth in new

accounts.  Boyd acknowledged that the Bank had been receiving fees not identified in

the Management Agreement to enable it to meet capital requirements for the first and

second quarters of 1997.  He suggested a new agreement with a new fee structure to

be backdated to January, 1997, "in order to substantiate the fees and provide an audit

trail for review by a bank examiner."  Exhibit 1173.

The new agreement was backdated making it appear to be consistent with the

actual compensation paid to BestBank during 1997, approximately $5 million greater

than what was due under the original agreement, which limited the Bank's

compensation to a 6% return on cost of funds.

Melody Long was the person primarily involved on behalf of Century in

negotiating the financial terms of the new agreement.  Her correspondence with Grace

and Boyd  reflected those negotiations which were not completed until September, 1997.

In March and December of 1997, BestBank sold preferred stock to Century in two transactions totaling $2,250,000.  Exhibits 1544 and 1545.   That price was not related to any market value and was recorded at a nominal value in Century's financial records.

The examiners from Colorado and the FDIC began questioning BestBank's business practices and a contentious relationship developed with Mattar becoming very defensive, accusing the examiners of a bias against sub-prime lending and a failure to understand the nature of it.  The adversarial posture taken by Mattar was reflected at a meeting between the Bank's directors and the Colorado regulators on April 15, 1996, which Mattar insisted be transcribed by a court reporter.  The transcript is in evidence as Exhibit 1424.  The purpose of the meeting was to discuss an examination that had not resulted in a report because some questions had not been answered.  No FDIC representative participated because of Mattar's requirement of a court reporter.  He accused the FDIC of "unreasonable, arbitrary and capricious behavior" toward the Bank.  Exhibit 1424.10.

In the Spring of 1997, Joseph Bour, who had been a State of Colorado bank examiner on an examination of BestBank in 1996, was hired to do special projects for the Bank.  In January, 1998, in the course of a discussion about a cardholder account with Penny McDowell, at the BankCard Center, Bour learned that credits were being posted to AATC cardholder accounts.  Bour then obtained cardholder account

15

information from Jack Hitt, an employee in the Bank's settlement department, who said he had no previous knowledge of such credits.  Together they saw evidence of credits that were not payments or returns and Bour concluded that the Bank may be exposed to a loss of $40 to $50 million.  Bour talked to Schmalzer and Grace about these concerns.  On the following day, January 27, 1998, Bour gave his letter of resignation to Grace and talked with Grace and Mattar in the latter's office.  Shortly after leaving the Bank, Bour met Boyd at a restaurant for lunch and in the course of their conversation, Boyd suggested that the credits may have been payments made by cash through Western Union.

Hitt was surprised by Bour's statement about the posting of credits.  He prepared spread sheets of Tran Code 22 transactions for November and December, 1997, and January, 1998, summarizing the $20 credits.

Peg Hirst, Penny McDowell's supervisor, was dismayed when McDowell told her that McDowell told Bour about the credits.  Boyd asked Bour if he had talked with McDowell although Bour had not told Boyd about the conversation.  The inference is that Boyd learned of it from Century.

Aware that knowledge of the posting of these credits would likely get to the regulators, the defendants undertook to save the Bank from closure by joining Century's schemes of false reporting.  The Bank officer defendants actively assisted Century in an effort to disguise the true value of the AATC portfolio and to confuse and misdirect the efforts of the regulators, the Bank's Board of Directors and other Bank employees to discover the truth.  Schmalzer and Hitt were attempting to find out the

16

amount and effect of the posting of the credits.  They went to Century's Florida office in February where they met with Hirst, Nemetz and FICI representatives.  Schmalzer asked Nemetz for a list of the accounts that had received the $20 credits.  She responded that she could not provide account numbers.  Schmalzer wanted the numbers of the cardholder accounts to enable him to review the individual accounts to learn the minimum payments due because to him it was conceivable that a $20 credit might be less than the minimum payment and therefore not affect the delinquency status of the account.  The AATC cardholder agreement required payment of $20 or 1.67% of the account balance "whichever is more."  Exhibit 998.13.  The AATC credit limit was $600.  It was obvious from the volume of the $20 credits that the purpose was to disguise delinquencies.  The review of the individual accounts was not necessary to reach that conclusion.

The disguise was enhanced by Century's change in March, 1998, from using Tran Code 22 to Tran Code 21 to post the credits as "other payments."  To compound the confusion, Century established the practice of wire transfer of funds from its operating account at BestBank to a Century account at the Farmers and Merchants Bank in South Carolina, then wire transfers from that account co-mingled with funds obtained from actual cardholder payments to the lock box at the Security State Bank in Abilene, Texas, followed by  wire transfers from that bank to BestBank.  That part of the scheme was developed in response to a concern that earlier the amounts received at the lock box were only about 55% of the aggregate of payments recorded, because the other 45% was the Tran Code 22 credits.

Those wire transfers of funds from Century's operating account required Bank approval.  That was given by Grace and Boyd after receiving from Melody Long memoranda explaining Century's cash requirements to pay expenses of its operations.  That practice began at the end of March, 1998.  Exhibits L-102 and 1158.  This practice had no relevance to the relationship established by either of the Marketing Agreements.

The Bank's Board of Directors was not informed about the $20 credits.  The packets of information provided to the outside directors for the monthly meetings, approved by Mattar, included reassurances from risk manager Schmalzer.  In April, he, Grace and a junior banker named Robert Ogburn traveled to Abilene to meet with FICI to create a better reporting system.  In his April Risk Management Report to the Board, Schmalzer informed that:

> Management continues to actively work with Berwyn and FICI to establish enhanced Management Information System reports that will enable better analysis of the quality of the portfolio, as well as reserve adequacy.

Exhibit A177.

In May, 1998, Grace faxed to Long a summary of the Bank's analysis of the AATC portfolio, indicating credits to 145,109 accounts within the last 60 days of which 43% showed no cardholder payments with a balance of $30 million as delinquent.  Exhibit 1133.  Long wrote corrections on the summary, contending that the $30 million was fully purchased by participation and assenting to apply funds from Century's reserve account.  That summary was incomplete and inaccurate.  It was based on Schmalzer's work and the actual amount of nonperforming accounts was far greater

18

than $35 million.

In his May Risk Management Report to the Board, Schmalzer said that enhanced reports identified additional nonperforming accounts approximating $40 million, but assured that those accounts would be segregated and placed into Century's participation. He also wrote that it was likely that management would require an additional $10 million from Century, either in the form of additional reserves or an increased participation. He gave further assurance that:

> Century's financial condition remains sound and continues to support its contractual obligations to the Bank.

Exhibit A178.

In his June report, Schmalzer wrote that Century was in default under its contract and on July 10, 1998, he sent a letter to Baetz, containing the following:

> BestBank has identified numerous credit card accounts that have been reflected as current due to internal credits; however, no payments have been received from the cardholders within 90 days. These accounts should have been reported as 90+ days delinquent. Consequently, these accounts totaling $46,940,468 have been allocated to Century's participation.
>
> Assigning these accounts to Century's participation then leaves the remaining participation and Century's reserve deficient per our contract. Specifically, the sum of Century's reserve and participation fails to cover $1,655,468 that is 60+ days delinquent and the required five-percent of all current accounts.
>
> Please contact us immediately to arrange a plan to cure the default.

Exhibit Y133. This was not a new discovery by Schmalzer. He had been misleading the Board in his monthly reports by failing to disclose what he knew about Century's use of credits.

In October, 1997, Colorado and FDIC examiners analyzed BestBank's condition as of June 30, 1997, and wrote a Report of Examination raising questions about the value of the credit card portfolio.  Mattar signed a formal response on March 18, 1998, on behalf of the Bank.  Exhibit 1375.

The tone of the response was arrogant and condescending which was consistent with Mattar's attitude toward the regulators from the beginning.  On page 1375.5, he suggested that technical deficiencies reported were due to the failure of the examiners to ask for documentation but he did not offer such documentation.  He did not personally meet with the examiners in the course of their work and he was not forthcoming with them in explaining the Bank's operations.  On page 1375.13, the following statements appear:

> BestBank's success in the sub-prime lending area results from the Bank's primary areas of expertise: controls, collections, systems, knowledge, management, and structure.
>
> • Intense collection efforts are required for sub-prime lending because of the nature of the customers.
> • The nature of the customers also requires a unique loan structure–all Best Bank consumer sub-prime loans are structured with monthly amortization and cash collateral.
> • Primary collateral is often real estate.
> • Secondary collateral is cash reserves equal to two payments.
>
> **Credit Card Receivables**
> The Bank has been in the business of sub-prime credit card receivables since 1990.  Century Financial Group, with whom Bank management has been familiar with and/or enjoyed a multi-year successful and profitable relationship at a previous bank, made a major commitment to build a processing and servicing center in Thornton during 1994.  BestBank began purchasing credit card receivables from Century after the service center was complete and a structure was in place to protect the Bank.
>
> Past performance and structure are the best indicators of future

20

performance.  The Bank has never taken a loss on a credit card receivable purchased from Century Financial Group.  The Bank has not owned a credit card receivable purchased from Century that is 30 days, or more, delinquent since prior to the third quarter of 1996.

The true facts are that the Bank was totally reliant on Century and did not establish the controls that are boasted about in the quoted language despite the knowledge that Century had repeatedly and consistently shown that it would not or could not perform its obligations in the Marketing Agreement.

On page 1375.15, the following statement is a blatant misrepresentation of the Bank's activities and is directly counter to the position taken by the defendants in this trial–that they were victims of fraudulent practices of which they were not aware.

Additional controls over the credit card receivable program include:

- Performance of the daily settlement function so that the Bank controls all funds released to Century for funding of the credit card portfolio and Century's operations.  This enables the Bank to also monitor the cash flows from the portfolio.
- Regular detailed analysis of the portfolio profitability and performance.
- Sampling on a random basis to verify that underwriting standards are met on new credit cards.
- Visitations to Century to access marketing practices, collections, systems, controls, and personnel on a first hand basis.

On page1375.19, Mattar's response said:

The Report correctly points out that the Bank's assets grew 163.76 percent during the time period June 30, 1996, to June 30, 1997.

***

- Rapid growth at BestBank between the two examinations was centered in loans and credit card receivables to consumers characterized as sub-prime.  This is the same business BestBank has been in since its inception in 1989 and therefore did not require any change to management, systems, controls, or approach to collections.

21

That assurance is contradicted by the correspondence from Boyd to Baetz and Gallant.

On page 1375.20, Mattar said:

> Participations enhance the quality of the Bank's assets because they contain all accounts 30 days or more past due or overlimit as well as additional current accounts.

On page 1375.25, he gave this assurance:

> Management also models the cash flows generated from the credit card portfolio to ensure the portfolio is self-supporting without Century.

On page 1375.30, the following statement appears:

> The Bank sets underwriting standards and they are contained in the Board approved Loan Policy:
>
> • Management monitors adherence to the underwriting standards daily by testing a sample of the credit bureau report for borrowers that were approved for credit cards.
> • The Bank is on-line to the credit card processor and monitors re-aging activity daily.
> • The Bank is on-line to the credit card processor and reports delinquencies daily.
> • Delinquencies are reported to the Board of Directors monthly.

Again, reassurance of the Bank's safety is given in this language at 1375.35:

> The Bank's methodology used to determine the adequacy of the ALLL has been consistent for several years and has been reviewed by many examination teams. The reason there is no provision for credit card receivables is that potential losses are more than adequately reserved for by the customer funded security deposits and Century cash reserve pledged to the portfolio.

The complicity of these defendants with Baetz and Gallant is reflected in this hostility toward the examiners and the efforts to assist Century in avoiding its contractual obligations to protect the Bank from losses. Those efforts include

misrepresentation of Century's financial ability to indemnify the Bank against losses on the credit card portfolio.

BestBank received Century financial statements from Long each month.  Those financial statements do not support the contention that the Bank was relying on Century to protect the Bank from any losses on the credit card receivables.  The monthly Century financial statements given to the Bank show that the primary source of Century's revenue came from the credit card portfolio through BestBank.  Thus, the financial strength of Century was premised on the same basis as the Bank; that is, payments from credit cardholders.  These defendants knew that in actuality those payments were disproportionately less than what should be expected from the number of accounts shown on the records even assuming the predictable rate of non-payment to be expected from a sub-prime portfolio.

The examiners began a closer look at the Bank in May when Andrew Shaw, a CPA with the Colorado Division of Banking, visited the Bank at the direction of Bank Commissioner Richard Fulkerson to attempt to verify cash flow projections provided by the Bank.  The Bank had included Century financial statements for the year ended December 31, 1997, with the Bank's cash flow projections which Shaw reviewed. Exhibit 1377.  He and Terry Quanstrum, an examiner from the FDIC, met with Grace and Schmalzer on May 26, 1998.  At that meeting, the examiners were given revised projections and a thick notebook of supporting data which Grace said was more realistic since it included data from actual experience after the time when the earlier

projections were made.  Exhibit 1379.  The examiners were not told about the $20

credits.

After reviewing the AATC program, Shaw concluded that it was unrealistic to

expect that cardholders would actually pay $543 to get $57 of available credit.  He

questioned the viability of the entire portfolio.

The examiners questioned Century's ability to perform on its indemnity

obligation.  In response, the Bank obtained an opinion letter from outside counsel,

summarizing his understanding of the arrangement with Century and providing a legal

opinion as to whether the Bank was in reality extending credit to Century within the

meaning of applicable Colorado Banking Regulations.  In that letter, addressed to

Schmalzer, counsel wrote this concluding paragraph:

> You have advised us that the Bank, in extending credit to
> cardholders, relies primarily on the cardholders to pay the credit card
> loans.  When the financial strength of Century is weighed against the
> aggregate amount of credit card loans outstanding, it is clear that the
> Bank is relying "primarily upon the responsibility of each maker for the
> payment of such loans...and not upon any full or partial recourse
> endorsement or guarantee" of Century.  This is why the Bank has
> established the credit criteria and relies upon its own credit judgment, not
> Century's, in approving or rejecting a credit card application.

Exhibit A219.

The record does not disclose what information the Bank provided to counsel to

form the basis for his opinion.  The author apparently considered some financial

information about Century showing that it did not have adequate strength to support the

volume of the credit card loan accounts.  It also appears that he was giving an

assurance based on lending policies and practices which existed only on paper and which the Bank had never followed.

A full examination of the Bank was conducted in June.  During that examination, Michael Tapp of the FDIC reviewed the Bank's customer complaint file and saw complaints from persons who received billing statements but denied ever applying for an AATC membership or Visa card.  Exhibits 1455, 1456, 1459 and 1464.  Tapp saw $20 credits on some cardholder statements forwarded with the complaints.  The responses to those complaints were all signed by Boyd.  Tapp's report is the first information the examiners had about the Century credits.

In the Fall of 1997, Boyd initiated an attempt to sell BestBank to Frank Farrar, a South Dakota banker known to Boyd.  Farrar, Mattar and Boyd signed a Stock Purchase Agreement, dated November 25, 1997, under which Mattar would sell his stock to Farrar and Boyd for $10,100,000 with the right to terminate before the closing date after doing due diligence.  Exhibit 329.

Farrar sent a team of representatives to the Bank and to Century to conduct that due diligence.  Gene Hawk, an experienced banker, reported the results of the due diligence effort to Farrar, under date of December 15, 1997.  Exhibit 334.  In his report, Hawk summarized his analysis in the following paragraph:

> The financial risk is enormous (See Attachments).  Century has provided Bestbank with over $80M of receivables for prepaid travel discounts for a cruise.  They argue that not all the card holders will take advantage of the trip but they will pay for it anyway.  Management also makes the argument that Century will buy back any account that is 60 days past due.   At the end of 1996 the bank has $42M in credit card receivables.  At the end of November the bank has $153M in receivables.  At the end of 1996 Century had purchased back $9.2M as a participation or 23% of the entire

outstandings.  As of November 1997 Century has a participation of $21.2 or 14% of the total outstandings.  It would appear that the credit is getting better or Century is providing more and more contracts thereby reducing the participation percentage by growth rather that quality.  The bank has increased receivables from $97M in May to $153 in November while Century's buyback went from $18.2M to $21.2 or an increase of only $3M while the receivables increased $56M.  The portfolio has increased 4.34 times since July 1996 while the actual charge-offs have increased 10.1 times.  In my estimation there is something inherently wrong in this process and it is virtually impossible to put a number on the loss.   From Centuries own financial statement they are unable to continue buying back receivables without tremendous growth on the other side.   This is a form of pyramiding and cannot be measured in dollars from the current information.

Hawk reported that the Bank has had a "running battle" with the regulators and a "combative management style."  Farrar exercised his right to terminate the purchase agreement.

On January 6, 1998, Boyd sent a memo to Schmalzer and Bour calling for a meeting the next day to discuss the need for new procedures to monitor and evaluate Century's data and performance.  Schmalzer prepared a proposed Third Party Control Policy for the Board's consideration at its March, 1998, meeting.  Exhibit A 8-111 to 118.  The Board decided to delay adoption of the policy until an independent audit of Century was completed.

In March, 1998, Baetz and Gallant consulted investment banker David Taffett of Infusion Capital Partners, L.L.C., to raise money for a ship.  He suggested the sale of the credit card portfolio and discussed that proposal with Baetz and Boyd.  Those discussions resulted in signing a Management Services Agreement on April 17, 1998.  Exhibit 489.  Infusion was to find potential purchasers of the "credit card pool" or a portion of it for a commission.  Taffett needed to compile information in a "book" to be

shown to prospects and Grace was given the task of compiling information at Taffett's request.  In response to Taffett's continuing requests for more information about performance of the portfolio, Grace wrote on July 10, 1998, that the requested data pertaining to operational issues was not available to the Bank and could only be provided by Century.  Exhibit 511.  Nothing about the $20 credits was disclosed to Taffett.

Mattar and Boyd made an effort to sell the Bank to Cerberus Partners in the late Spring of 1998, through an intermediary, Robert Loper.  The preliminary proposal was for 60% of Mattar's stock at a price to be determined by a complicated formula based on the value of the Bank's capital determined according to generally accepted accounting principles.  Ronald Goldstein, a principal with Cerberus, conducted due diligence, becoming particularly interested in the relationship between BestBank and Century.  There were many exchanges during several months.  In July, 1998, Mattar visited Goldstein at his office in New York City and Mattar said that he would take $10 million because he wanted to retire and quit the banking business.  The State of Colorado closed the Bank four days later.

Hawk's quoted observations in his report to Farrar were based on information and data known to each of the defendants.  The risks he noted were known to them when they attempted to make the deal with Cerberus.  They were fully aware of what Hawk described as "pyramiding."  They knew much more about Century's financial condition than Hawk.

In response to Schmalzer's recommendation and the Board resolution to obtain an independent audit, Mattar had enlisted his accountant, John Carney, recommending him to Baetz and Gallant, well knowing of his limited capability to conduct the testing necessary for a proper audit and Carney's interest in maintaining a business relationship with Mattar and the Bank.  Carney noted that Century's income was largely from the AATC card program.  In the course of his work, Carney learned of the credits but he accepted the explanation that the marketing program was so successful that AATC could not keep up with the fulfillment packets and the minimum $20 payments were made for customers who had not received those packets.  Carney did an Independent Accountant's Review Report, dated December 1, 1997, of Century's internal financial statements for nine months ending September 30, 1997.  He  included the following qualifications in his letter.

> A review consists principally of inquiries of company personnel and analytical procedures applied to financial data.  It is substantially less in scope than an audit in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements taken as a whole.  Accordingly, I do not express such an opinion.

Exhibit 343.3.

That report was provided to Cerberus and the negotiations dragged on largely because Goldstein was not satisfied that Century had the financial capability to perform its purchase and indemnity obligations in the Marketing Agreement.  In the audit work that Carney did for BestBank, he did not test the credit card receivables because he assumed that Century would make good on its contractual duty to purchase delinquent accounts.

Despite the January, 1998, disclosure of the credit payments by Century, the AATC card portfolio grew by large numbers in the succeeding months. The government's analysis shows that in the first six months of 1998, 200,000 new accounts were added increasing the loans by $108,000,000. Exhibit 389. These new accounts reported by Century were accepted at face value by BestBank, enabling Mattar and Boyd to each receive bonus payments of $2,427,828 on January 22, 1998, and $2,316,081 on April 23, 1998. A bonus payment of $25,000 went to Grace in January, 1998, and he received an additional payment of $92,643 on April 30, 1998, recorded as a bonus.

After the June examination, Commissioner Fulkerson and Terry Quanstrum of the FDIC concluded that the Bank was insolvent. Commissioner Fulkerson ordered an infusion of new capital of $151,515,000 immediately on July 22, 1998. Exhibit 1389. Upon failure to meet that requirement, the State of Colorado closed BestBank on July 23, 1998. The FDIC was appointed Receiver.

The FDIC brought a civil action in this court seeking a money judgment against these defendants and retained accounting experts to attempt to determine the losses sustained as a result of the Century credit card programs. In approaching that task, Jeffrey Opp decided that it was necessary to create an entirely new database from the FDR and FICI processing records to use for making the computations and analyses which were then done by Andrea Loschen and Dana Chamberlin. Their work has been submitted and the validity of the results of their analyses has been challenged.

These defendants did not have all of that analytical data when they managed the Bank.  That does not excuse their culpable conduct.  What is certain, beyond a reasonable doubt, is that from late 1994 to July 23, 1998, the asset value of the loans receivable from the credit card portfolios generated by Century was inflated so substantially that it distorted the capital accounts in the Bank's financial statements which supported the Call Reports submitted to the FDIC identified in Counts 47 through 54 of the Second Superseding Indictment.  It is also clear beyond a reasonable doubt that these overstatements of value were caused by false and fraudulent records submitted to the Bank for which Baetz and Gallant have criminal responsibility by engaging in the conspiracy charged in Count 1 of the Second Superseding Indictment.

Mattar, Boyd and Grace are accused of joining that conspiracy.  To find these defendants guilty on that conspiracy count the evidence must demonstrate beyond a reasonable doubt that Mattar, Boyd and Grace acted with the criminal intention to defraud the Bank and did so in concert with Baetz and Gallant to commit at least one of the crimes alleged to be among the multiple objects of the conspiracy.

The evidence does not support a finding that any of these three defendants had such an intention at the beginning of the Century secured credit card program.  The prosecution does not make that claim.  What is argued is that all three of them became aware of the fraudulent practices of Baetz and Gallant by Weidmaier's reports of concern in January, 1995, and joined in the conspiracy rather than taking corrective action to protect the Bank.

It has been shown that each of them knew that Century was deviating from the policies and practices established under the Marketing Agreement and they failed to meet their fiduciary duty to the Bank to require Century to perform as promised.  As these defendants learned more about Century's operations and the unreliability of the performance reports given to the Bank, they were unwilling to accept the reality of the adverse effects on the Bank and, at some time, their misfeasance turned to malfeasance transforming them from victims to criminals.  They then knowingly and willfully aided and abetted the conspiracy by actively misleading the Bank's Board of Directors and the examiners of the Bank as to its true financial condition and concealed their knowledge about the Bank's exposure to loss from non-performing and non-existent cardholder accounts.

It is difficult to determine the time of that transformation.  The Weidmaier memos of January and June, 1995, are confusing and his opinions about the potential of contingent liability for merchant charges that will not be paid is not a logical conclusion from his observation of accounts without security deposits and the re-aging of delinquent accounts.  Grace's memo to Boyd of May 25, 1995, identifying the need for immediate action to prohibit placing a new account in the FDR system prior to having a cleared security deposit and completed application and the failure to enter charge-offs on the FDR system, Exhibit 80, together with Boyd's memo to Baetz and Gallant to the same effect, Exhibit 58, show that they knew that Baetz and Gallant were not reliable business partners.   Continuing to do business with them was not yet a crime.  The essential element of criminal liability is the intent to defraud the Bank as a regulated

financial institution.  These defendants acted in the Bank's interest in the sale of performing accounts to BANKFIRST and in requiring Century to pay over its share of the sale proceeds thereby avoiding a loss of as much as $2 million.

Undertaking the new AATC program under Century's control was unwise but not criminal conduct.  The decision to hire John Hitt away from the Bankcard Center to perform the daily settlement function in the Bank was an appropriate step to protect the Bank's interest.  His monthly MIS reports on a format designed by Grace was another appropriate step.  When Hitt observed that delinquencies were being reduced by a larger number than payments and reported that to Grace, there was enough warning to justify inquiries that were not made but that too does not equate with a criminal intent.

Considering all the evidence, it has been shown beyond a reasonable doubt that in January, 1998, all three of these defendants joined with Baetz and Gallant in the cover-up of the fraudulent practices that infected the AATC portfolio and began to actively assist in continuing to market the program aggressively and to accept false data.  The apparent viability of the program depended upon reporting new accounts. Mattar, Grace and Boyd all knew of the false representations made by Mattar in his March, 1998, response to the report of examination.   The huge bonuses taken by Mattar and Boyd in 1998 with their knowledge of the falsity of the Bank's financial reporting and their deception of Wolfschlag and the other Board members demonstrate both motive and intent.  These bonuses depended on the large additions to the receivables in the months before closure.  Grace received his only bonuses during this time and he knew they were not justified.

Gary Schwartz, an accountant called as a witness by the defendants, testified that if Century had performed as promised in the Marketing Agreement, the Bank would have had adequate capital to continue operation.  That opinion supports the finding of the defendants' guilt because at least from January, 1998, to the Bank's closing, they all knew that Century had not been performing and had disguised that non-performance by fraudulent practices resulting in false financial records at BestBank.  They knew that Century could not protect the Bank against losses.  With that knowledge each of the defendants aided in Century's deception and actively deceived the outside directors by false reporting to them with respect to Century's practices and the value of the AATC portfolio.  The 1998 bonuses were paid because of that deception.

The prosecution contends that Mattar, Boyd and Grace joined the Baetz and Gallant conspiracy in January, 1995, relying on the Weidmaier memorandum disclosing deficiencies in the operation of the secured card program.  Given the totality of the evidence that contention is supported by enough evidence to warrant a finding by the preponderance standard, supporting the rulings of admissibility of statements under Fed.R.Evid. 801(d)(2)(E) but it is insufficient to find that any of these Bank defendants had the requisite criminal intent beyond a reasonable doubt at that time.

The evidence does prove beyond a reasonable doubt that beginning in January, 1998, and continuing to the closing of BestBank on July 23, 1998, each of the defendants, Edward Mattar, Alan Boyd and Jack Grace joined in the ongoing conspiracy to defraud BestBank, begun by co-defendants Baetz and Gallant in 1994 and that overt acts alleged in the Second Superseding Indictment were committed.  The

33

defendants are guilty of the offense charged in Count One, a violation of 18 U.S.C. §
371.

The substantive charges of Bank Fraud, in violation of 18 U.S.C. § § 1344 and
2, are alleged as Counts 2 through 44. They are based on the same scheme that is in
the conspiracy charge.

The charges in Counts 2 through 25 are that bonus payments made to
defendants Mattar and Boyd from January, 1995, through October, 1997, were
executions of the fraudulent scheme. The statute provides two separate means of
committing bank fraud. It criminalizes a scheme to defraud an FDIC insured bank and
it also makes it a crime to obtain the Bank's funds by means of false or fraudulent
pretenses or representations. The government failed to prove the bonus payments
identified in these counts resulted from such means for which these defendants are
culpable. The Bank's Board of Directors approved these bonus payments as being
within the performance criteria that had been adopted and while they were not justified
by the true facts, it is not clear that these defendants had sufficient knowledge to know
that the information given to the Board was falsified to deceive the outside directors.

The evidence shows that the information those Board members relied on for the
bonus payments made in 1998 was false and fraudulent and that the recipients
deliberately deceived the outside directors and Wolfschlag with the intent to obtain the
Bank's funds in the form of the 1998 bonus payments. Accordingly, Edward Mattar is
not guilty of Counts 2 through 25 and is guilty of Counts 26 through 31. Defendant
Alan Boyd is not guilty of Counts 2 through 25 and is guilty of Counts 26 through 31.

Defendant Jack Grace is not guilty of Counts 2 through 25 and is guilty of Counts 26 through 31.

The premise of the bank fraud charges in Counts 32 through 44 is that the amounts identified as "transfers" to the Century operating account at BestBank are the totals of credits posted to Century as sales of AATC memberships and other monetary transactions affecting AATC cardholder accounts.  In closing argument, the government says that these are transfers of the "proceeds from new sales and other activity to the Century operating account as a result of daily settlement."  As noted earlier, the sale of an AATC membership resulted in a merchant charge of $498 on a cardholder account. If the account was actually opened that charge would properly be a credit to the Century operating account.  These credits were improperly posted where there were no actual sales in accordance with the established requirements for new accounts.  Thus, the "transfers" would be fraudulent to the extent that the merchant charges for the membership fee and the annual fee of $45.00 were made for "accounts" that would not be performing.  The flaw in the prosecution theory behind these counts is that the evidence is not clear that these amounts, calculated by Dana Chamberlain, represented such improper merchant charges.  The evidence does not show that the bank officer defendants knew of the extent of the improper charges and Chamberlain simply analyzed AATC net sales as reflected in processor reports without separating those that were invalid from those that were valid.  Accordingly, the prosecution did not prove that these Counts 32 through 44 were executions of the bank fraud scheme and the defendants are not guilty of those counts.

Count 46 charges Alan Boyd with acceptance of a bribe from Baetz and Gallant in violation of 18 U.S.C. § 215 in 1996.  The supporting evidence is that Boyd and his former wife, Barbara Owen, received payments from Century ostensibly in repayment of principal and interest on a $350,000 loan to Century for the latter's purchase of equipment and a $350,000 loan origination fee.  The prosecution argues that a 100% origination fee is itself so unusual and different from a normal commercial lending practice as to warrant an inference that it was a payment made and accepted corruptly for the purpose of causing Boyd to "overlook" Century's fraudulent practices and influence the Bank in continuing to fund Century's credit card program.  The evidence is not sufficient to support a finding of guilt on this count.  Alan Boyd is not guilty of Count 46.

All of these three defendants participated in the preparation of the quarterly reports of the Bank's financial condition required by the FDIC entitled Consolidated Report of Condition and Income, commonly referred to as Call Reports.  A material element of information in those reports is the status of the Bank's loans.  One of the purposes of the reports is to give assurance that an insured bank has made adequate provisions for expected losses and has adequate capital to support its business.  Accordingly, a bank's history of losses and delinquent accounts must be accurately recorded to make the report reliable.

In Counts 47 through 52, the prosecution claims that the bank officers intentionally falsified those reports for the quarters ending June 30, 1995, through October 30, 1997, by misrepresenting the number of delinquent credit card accounts

for those periods.  Because the evidence is not sufficient to prove beyond a reasonable doubt that these defendants knew that Century could not perform its duty to purchase delinquent accounts and protect the Bank from any losses during this time, the defendants are not guilty of those counts.

On January 30, 1998, and April 30, 1998, when the Call Reports for the quarters ending December 31, 1997, and March 31, 1998, were filed, the defendants knew that they could no longer expect Century to meet its obligations and that there were undisclosed delinquent credit card accounts in such volume as to highly inflate the value of the Bank's assets, making its capital accounts false.  The crimes charged in Counts 53 and 54 have been proved making all three defendants guilty of those counts.

The defendants are charged with wire fraud in violation of 18 U.S.C. § § 1343 and 2 in Counts 55-64.  Counts 55 through 57 charge transmissions by Alan Boyd in connection with the proposal to sell Mattar's stock to Frank Farrar.  Counts 58, 59, 60 and 62 through 64 are transmissions relating to the attempted sale of Mattar's stock to Cerberus Partners.  These charges allege that these defendants together with Baetz and Gallant participated in schemes to defraud those prospective purchasers by concealing Century's manipulations of performance data and Century's financial condition.  The defect in the Farrar counts is that the defendants' submission of Hitt's spreadsheets and other reports of performance occurred before the disclosure of the credits and the criminal coverup beginning in January, 1998.  The defendants' guilt of the charges in Counts 55 through 57 has not been established beyond a reasonable doubt.  They are not guilty of those counts.

The effort to sell to Cerberus is a different matter.  That began in May, 1998.  By that time the defendants knew that the assets of BestBank were not as recorded because the value of the AATC credit card portfolio was highly inflated and Century could not cover the losses.  They also knew that the examiners were raising questions that could not be answered, making it likely that adverse action would be taken against the Bank.  Given that knowledge and the representations that were being made in the course of the due diligence efforts on behalf of the prospective buyer, in which each defendant had knowing and wilful participation and the transmissions charged, with the exception of Count 61, having been made in furtherance of this criminal scheme to defraud, the defendants are guilty of Counts 58, 59, 60 and 62 through 64.

The defendants are charged with the substantive offense of wire fraud in violation of 18 U.S.C. § 1343 in Counts 65 through 73 in a scheme to defraud David Taffett and Infusion Capital in an attempt to sell credit card accounts by means of false and fraudulent representations in the course of the due diligence inquiries.  Because the evidence is unclear as to what was being offered for sale and whether the transaction was to be an outright purchase or a participation, the necessary element of an identifiable scheme to defraud has not been proven beyond a reasonable doubt making the defendants not guilty of those counts.

In Counts 75 through 88, all defendants are charged with money laundering in violation of 18 U.S.C. § 1956.  These counts are the wire transfers of funds between BestBank in Colorado, Farmers & Merchants Bank in South Carolina and Security State Bank in Texas previously discussed as a method of concealing Century's credits

by co-mingling them with actual cardholder payments.  There are two ways in which this statute can be violated.  One is disguising the proceeds of criminal conduct.  The other is promoting the illegal activity.  While both means are charged, the prosecution relies on the promotion element to support these counts.  The defect in the government's position is that these transfers included actual payments.  While the government has presented evidence of the extent of the credits, it cannot be said with sufficient clarity that these transfers represented the proceeds of bank fraud, accordingly, these counts have not been proven beyond a reasonable doubt.

In Count 89, Alan Boyd is accused of securities fraud in offering for sale through a broker, 10,000 shares of Columbia Capital Corporation owned by his ex-wife.  The elements of securities fraud have not been proven.  He is not guilty of this count.

Count 90 charges securities fraud against all defendants in the attempt to sell Mattar's stock to Cerberus Partners.  The elements of liability have not been established beyond a reasonable doubt.  The evidence shows preliminary discussions and negotiations about a possible transaction but they did not reach the stage of an actual offer to buy or an offer to sell Mattar's stock.  The defendants are not guilty of Count 90.

In summary, the ultimate findings are as follows:

Edward P. Mattar, III, is guilty of the crimes charged as Counts 1, 26-31, 53, 54, 58, 59, 60 and 62-64 in the Second Superseding Indictment and not guilty of Counts 2-25, 32-44, 47-52, 55-57, 65-73, 75-88 and 90.

Thomas Alan Boyd is guilty of the crimes charged as Counts 1, 26-31, 53, 54, 58, 59, 60 and 62-64 in the Second Superseding Indictment and not guilty of Counts 2-25, 32-44, 46, 47-52, 55-57, 65-73, 75-88, 89 and 90.

Jack O. Grace, Jr., is guilty of the crimes charged as Counts 1, 26-31, 53, 54, 58, 59, 60 and 62-64 in the Second Superseding Indictment and not guilty of Counts 2-25, 32-44, 47-52, 55-57, 65-73, 75-88 and 90.

On the government's concession, Counts 61, 66 and 68 are dismissed.

DATED: February 12th, 2007

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge